Spitzer, Treasurer, Appellant, *v.* Buten et al.

Argued April 20, 1931. Before FRAZER, C. J., WALL-ING, SIMPSON, KEPHART, SCHAFFER and MAXEY, JJ.

*William A. Gray,* for appellant.—The rule to open judgment should have been discharged: Hubbard v. Tenbrook, 124 Pa. 291; Youghiogheny I. & C. Co. v. Smith,

66 Pa. 340; Brown v. T. & T. Co., 174 Pa. 443; Wachter v. Assurance Co., 132 Pa. 428; Hayes's App., 195 Pa. 177; Himes v. Herr, 3 Pa. Superior Ct. 124.

*Isidore H. Schweidel,* of *Cohen, Schweidel & Krekstein,* for appellees.—It is submitted that the notes having been executed by the comakers for a specific purpose, the lenders having knowledge of this purpose and the notes having been used for another purpose, the makers are not liable therefor: Mahoning Val. Bread Co. v. R. R., 83 Pa. Superior Ct. 379; Humphrey v. Brown, 291 Pa. 53; Dougherty Distillery Warehouse Co. v. Binenstock, 293 Pa. 566.

A guaranty is not effective until notice of its acceptance is given by the person receiving the guaranty: Siegel & Co. v. Baily, 252 Pa. 231; Evans v. McCormick, 167 Pa. 247; Pritchett v. Wilson, 39 Pa. 421; Miners State Bank v. Auksztokalnis, 283 Pa. 18.

A forbearance to sue on a claim which one did not actually have could not possibly constitute a valid consideration: Bryant v. Bryant, 295 Pa. 146; Schroyer v. Thompson, 262 Pa. 282; Clark v. Russel, 3 Watts 213; Sidwell v. Evans, 1 P. & W. 383; Cobb v. Page, 17 Pa. 469; Saalfield v. Manrow, 165 Pa. 114.

OPINION BY MR. JUSTICE SIMPSON, May 11, 1931:

The treasurer of the Mutual Aid Division of the Pannonia Beneficial Association, hereinafter called the Association, the real party in interest in this case, appeals from an order of the court below opening a judgment entered in his favor, as treasurer, upon two notes admittedly signed by the defendants. The order must be reversed.

The seven defendants are brothers-in-law. Samuel Englander, one of them, was their trusted agent; as was said by another of them, and in substance echoed by the rest: "We had so much confidence in Mr. Englander we just left everything to him; whatever he asked

us to do, we did." At a family gathering, he suggested to the others that it was a good time to purchase real estate, which could then be bought at a bargain and later sold at a profit. The others agreed with him, but did not have the money for the purpose. Englander was a member of the finance committee of the Association, and it was suggested by some one, probably Englander himself, that he could possibly get the money from it. All hands agreed he should try to do so, and they all then signed the two judgment notes in blank, and delivered them to him so that he could use them to obtain the money. So far as the depositions show, there was no restriction placed upon him as to the way in which he should use the notes to get the money, or the method he should adopt in investing it after he received it. All that defendants asserted was that he was to get the money from the Association on the notes and use it "for the group" (as they called themselves), in the purchase of real estate, each to get a proportion of the profits realized from its later sale. It is true some of the leading questions and answers thereto by defendants are as follows: "Q. Did you ever authorize Samuel Englander to receive money from Pannonia for you? A. No." What was meant, however, was shown by the answer of one of them to another question by his own counsel: "Q. In other words, you did not sign that note for Mr. Englander *to get any money for himself?* A. No." Another defendant testified: "Q. Well he [Englander] was to borrow the money from the Pannonia? A. Borrow it for the benefit of all the brothers-in-law and *go ahead with the proposition.*" And still another: "Q. And he [Englander] was to get this money for you for the purpose of using it for the benefit of all you gentlemen, and make money for you, wasn't he? A. I suppose so; that is usual...... Any time I gave Sam Englander any money or authorized him to do anything with any money that belonged to me, I never questioned what happened with it afterwards. Q. Precisely. Therefore, you

waited until he got ready to tell you how much money had been made, and divide the profits?   A. Yes, sir." All of defendants testified to the same effect.

Apparently the Association did not keep a large amount of money on hand, but obtained it, as needed, by a sale of its shares of stock, or by the receipt of installments on those previously issued.   Presumptively defendants knew this, since each of them either was then or previously had been a member of the Association.   The result was that when Englander undertook to borrow the money on the notes, he was only able to get it in installments as the Association collected it, and the arrangement was made, therefore, that he should give his note for each installment when and as received, and when the amount thus obtained by him aggregated $25,000 he should deliver to plaintiff one of the judgment notes signed by the defendants, and, when the later payments aggregated the second sum of $25,000, the second of said notes should be delivered to plaintiff. This was the course pursued.

So far as appears, none of the defendants at any time denied liability on the notes until they applied to have the judgment opened, and neither then, nor at any time before or since, not even in their depositions, did they deny that Englander was entitled to make the foregoing arrangement with plaintiff in order that he might get the money for joint account.   Nor have they at any time denied, in their depositions or elsewhere, that he was entitled to and did get the money; nor have they averred or testified that he did not use it, when received, for the purchase of real estate, on joint account, exactly as it was agreed he should do.   The limit of their contention is that the six defendants did not personally receive any of the money paid by the Association; but it was never intended that they should.

Appellees say in their brief: "There is not a single word of testimony anywhere to show that the appellees agreed to repay to the plaintiff money loaned by the

plaintiff to Englander. That is the very point on which the case turns." They overlook the testimony we have quoted above, and forget also that there was no restriction put on the way Englander should get the money from the Association, but only on the way he should use it after he got it, and there is no evidence that he did not use it exactly as it was intended he should. It may be that ordinarily the Association could not recover on the notes, if this was an attempt to hold defendants liable for an indebtedness incurred by Englander to it, with which previously they had no connection; but that is not this case. The uncontradicted evidence is that Englander's arrangement with the Association was, from its inception, that the installment loans were to be secured by the judgment notes in suit, and that admittedly they were executed and delivered by defendants to Englander before any of the installments were paid, for the very purpose of enabling him to borrow on them from the Association, and without any limitation upon him as to the way in which the borrowing should be accomplished. It is not merely that defendants, by their acts seemingly invested him with authority to use the notes in any way he chose, in order to get the money from the Association; but the unquestioned fact is that they intended to clothe him with that kind of authority, and hence cannot defend because he exercised it. Even if he had used the money in a way not intended when the notes were given,—and of this there is no evidence,—we would still have to hold that the loss must fall on defendants, for it was their misplaced confidence in him which caused it: P. R. R. Co.'s App., 86 Pa. 80; Keller v. New Jersey Fidelity, etc., Ins. Co., 299 Pa. 315.

The order of the court below is reversed, the judgment is reinstated and the rule to open it is discharged.