## Fifth Street Building and Loan Association, Appellant, *v.* Kornfeld et al.

Argued April 18, 1934. Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Palmer Watson,* for appellant.

*Harry Shapiro,* for appellee.

OPINION BY MR. JUSTICE MAXEY, May 21, 1934:

Plaintiff filed a bill in equity against the defendants, setting forth, inter alia, that on or about June 26, 1928, an application was made by codefendant Samuel Kornfeld, to the plaintiff for a loan of $35,000, secured by a mortgage upon premises on North 3d Street, Philadelphia, and that on August 27, 1928, one Soffian, the agent of Kornfeld, wrote to the plaintiff, stating that Kornfeld would assign as additional security for the proposed loan, a lease from the Gordon Sanitary Linen Supply Company, under which (so Soffian wrote) a rental of $400 a month would be paid Kornfeld for the ensuing ten years. Thus induced, plaintiff agreed to make the loan. On September 18, 1928, a lease embodying the terms stated and in which Samuel Kornfeld was described as "lessor" and the Gordon Sanitary Linen Supply Company as "lessee," was signed by Samuel Korn-

feld, obviously as lessor, and by "Gordon Sanitary Linen Supply Company, Eva Blank, Secretary," obviously as lessee. This was immediately assigned by Kornfeld to the association as security for the loan of $35,000 at once thereafter made to him. Accompanying this lease was a copy of a purported resolution of the supply company, reading substantially as follows: That this corporation leased from Samuel Kornfeld the premises in question for a period of ten years from July 18, 1928, at a monthly rental of $400, and authorized its secretary to execute such a lease. This resolution bore the date, July 16, 1928, was signed "Eva Blank" and had the corporate seal attached. At this time the Supply Company was occupying the premises described, under a verbal lease from Kornfeld, at a rental of $300 monthly, and on November 22, 1929, Kornfeld as owner entered into a written lease with the Supply Company for the same premises, its treasurer signing it, for one year from December 1, 1929, at a rental of $250 each month (the company being unaware of the existence of the spurious ten-year lease and Kornfeld closely guarding that secret). At the time of the execution of the spurious lease, Kornfeld owned 53% of the stock of the Supply Company and was one of three directors and was president and secretary, and then and since December 28, 1927, had by written contract "full control of the policy and conduct of the business of the corporation."

On or about July 28, 1930, a notice was served on the Supply Company by the plaintiff to send "a check for rent now due or which will hereafter become due" for the occupancy of the premises, to the attorney for the plaintiff. This was unheeded and on October 3, 1930, a levy was made on the property of the company for the amount due. Certain sums were then paid on this account from time to time thereafter by Kornfeld to the plaintiff. On January 28, 1932, the name of the defendant was changed by due proceedings to "Gordon-Nick Linen Supply Company." On June 21, 1932, suit was brought by plaintiff

against the defendant to recover rental then in arrears, amounting to $2,200. In the affidavit of defense filed it was denied that the defendant corporation ever adopted the above resolution of July 16, 1928, or ever authorized Eva Blank to execute any lease in its behalf, and the company further alleged that it occupied the premises under a lease dated November 22, 1929, between Kornfeld and it, at a rental of $250 per annum for the term of one year from December 1, 1929, which lease it had declared terminated. The company also stated that it had vacated the leased premises.

When the case came up for trial on October 6, 1932, plaintiff discovered that Eva Blank who signed the lease as secretary was not in fact the secretary, and it suffered a voluntary nonsuit. Plaintiff then entered the bond accompanying its mortgage which was security for the $35,000 loan, in the court of common pleas and subpœnaed Kornfeld to appear for oral examination. He there testified that Eva Blank was *his* secretary, and *not the secretary of the corporation;* that he had told her to execute the lease as secretary of the supply company. He was asked: "In other words, you purposely perpetrated a fraud on the Fifth Street Building and Loan Association at that time?" He answered: "No, I did not." He was asked by the court: "What do you call that?" He answered: "I was president and secretary, I was making the lease for the corporation with myself, who was the owner, and since there would be no other name on either one, I had her as my secretary sign the lease and resolution, as my secretary, to act as secretary of the corporation, so that there would be another name attached other than mine to the lease and the resolution."

The bill further sets forth "that it therefore appears that this lease is defective in that it is not signed by the said Samuel Kornfeld in his capacity as President and Secretary of the Gordon Sanitary Linen Supply Company; that he had authority so to sign it, and that it was

the intention of the parties at the time this lease was executed to bind the Gordon Sanitary Linen Supply Company; that a demand was made on or about the 10th day of November, 1932, on the Gordon-Nick Linen Supply Company to execute the said lease in accordance with the intention of the parties, but said corporation failed and neglected to do so." Plaintiff in the bill prayed: (a) that the contract of lease be reformed by adding after the signature of Kornfeld [the lessor] the following: "individually and as President and Secretary of the Gordon Sanitary Linen Supply Company"; (b) that the contract of lease be declared a valid lease and a binding obligation on the supply company; (c) that a decree be entered directing the payment of rental now due and hereafter to become due to the plaintiff corporation.

The court below dismissed the bill, saying, inter alia: "It is clear that Kornfeld, in causing a feigned execution of the lease on behalf of the corporation, was not acting for the corporation but prejudicially to its interests and solely for the purpose of obtaining for himself a loan from the plaintiff upon a fictitious security. He kept all knowledge of this fraudulent lease from the corporation and continued to collect from it the rentals stipulated in the original verbal lease and its written successor executed November 22, 1929. The execution of the latter lease by John M. Donaghue, treasurer, for the corporation, indicates that such matters were not placed solely in the power of Kornfeld by his contract of employment. Furthermore, its execution after that of July 18, 1928, at a less rental and for a shorter term, while the latter lease, if valid, had yet nearly nine years of life, shows conclusively that the corporation, except for its faithless president, had no knowledge of the existence of the fraudulent lease. The Act of May 12, 1925, P. L. 615, has no application to the facts of this case [for the reason that] the questioned lease was not signed by either president, vice-president, secretary or treasurer of the

defendant corporation. Kornfeld was its president and secretary, but he signed only in his individual capacity as lessor while the signature for the purported lessee was attached by a stranger to the corporation. The plaintiff is unfortunate in having been victimized by Kornfeld, but its misfortune cannot be shifted upon the defendant corporation."

Appellant's first proposition is that the appellee corporation is estopped from denying the validity of the spurious lease executed in its name because during two or three years the rent due thereunder was paid in its behalf. The flaw in the supporting argument is that the acts relied on, i. e., the paying of rental as a basis of estoppel, were the acts of Kornfeld and not of the corporation. Appellant says: "He [Kornfeld] was the corporation." This is not true. He was the faithless servant of one corporation practicing in his own interest a fraud on another corporation. If the appellee corporation, as contradistinguished from its faithless president and secretary, had by its words and conduct wilfully caused the appellant to believe in the existence of a certain state of things and induced it to act on that belief so as to alter to its disadvantage, its previous position, the appellee would be estopped. See Reel v. Elder, 62 Pa. 308. The checks appellant received for rentals after the execution of the supposed lease were Kornfeld's personal checks and not the checks of the corporation. Appellant, by receiving these checks, was not being misled to its disadvantage by *appellee's corporate* acts but by *Kornfeld's personal* acts. Furthermore, these "acts," i. e., the delivery of these checks, even if they had been the company's, did not alter appellant's position to its disadvantage. Appellant's loan which the spurious lease induced had been made before any check of rent for the premises in question had been received by appellant.

Appellant's next proposition is that the corporation appellee should be held liable under the rule that where one of two innocent parties must suffer, he who clothed

the wrongdoer with power to cause the injury must suffer the loss. Appellant both misinterprets this rule and attempts to apply it in a kind of action where it is wholly inapplicable. A typical example of the proper application of this rule is in a case where A put B in possession of something of value under circumstances which make it appear that B owned, or at least had the authority to dispose of, this valuable thing, and B did fraudulently dispose of it to C, an innocent purchaser, for a good consideration, and then A sues C for the value of this thing, or seeks to recover it in an action of replevin. In such a case it is a good defense for C to show that A, by his carelessness, put B in a position to perpetrate the fraud complained of and whose evil results must fall on either A or C. For example, in Vanderslice v. Ins. Co., 13 Pa. Superior Ct. 455, a plaintiff sued the insurance company for the value of certain insurance policies which had been delivered to her, with assignments duly executed by the former owner, but in which the assignee's name had not been inserted. Plaintiff's husband, who represented plaintiff in the transaction, handed these policies to the agent of their new owner and this agent fraudulently inserted his own name instead of that of his principal, as assignee, and thus gave himself the appearance of owner, and demanded and received from the insurance company what the owner was entitled to receive under the insurance contract. The defendant company had no notice of the fraud. In an action against the insurance company for what is described as "the deposit money" on these policies, it was held that "the plaintiff had placed the policies in the hands of her agent in a condition which enabled him to transfer the policies to any person whom he might select. She trusted him as her agent, and gave him the power to perpetrate a fraud, and it was her misplaced confidence which caused this loss. Where one of two parties who are equally innocent of actual fraud must lose, the one whose misplaced con-

fidence in an agent or attorney has been the cause of the loss shall not throw it on the other."

The same principle is also invoked in P. R. R. Co.'s App., 86 Pa. 80, where it was held: "Where the owner of stock intrusts the certificates with blank powers of attorney to an agent for safe-keeping, who fraudulently transfers them to a third party, who in turn, without knowledge of the fraud, has them transferred to himself, the owner cannot recover from the corporation for the loss." The principle underlying this rule is that an owner of property who has been deprived of it by the fraudulent act of a second person who in turn has disposed of it to an innocent purchaser who relied on the second person's apparent authority to sell it, is estopped from asserting his title to it, when it is shown that he clothed the second person with the apparent title to or authority to dispose of it. There is thus presented a case where the owner's negligence has enabled a wrongdoer to commit a fraud on both the owner and an innocent third person, and this negligence is held to work an estoppel against the owner in the resulting action between the two defrauded parties. See O'Connor v. Clark, 170 Pa. 318, 32 A. 1029, and Spitzer, Treasurer, v. Buten et al., 303 Pa. 572, 154 A. 917.

In the case before us the rule is not being invoked by *defendant* as a bar to a claim against it, but is being invoked by *plaintiff* in an attempt to move the court to force the defendant to execute a certain lease (which would have value to the plaintiff) because the faithless agent of the corporate defendant represented to the plaintiff that the defendant had executed such a lease, and then tendered to the plaintiff *a* lease purporting to be the *defendant's lease,* which *in fact had not been executed by any officer of the defendant company.* The very statement of what appellant proposes the court should do under the supposed authority of the rule it invokes, carries its own condemnation of the proposal as one that could find no support in any principle of law or equity.

Furthermore, the principle that where one of two innocent persons must suffer loss for the fraud of a third, the loss should ordinarily fall on the one whose act facilitated it, is entirely misconstrued by anyone who thinks it can be invoked here. This principle cannot be interpreted and applied literally. Under a literal interpretation of it, if C introduced B to A, and B then defrauded A, C should be held liable for the resulting loss on the theory that his introduction of B to A "made the fraud possible." This principle has never been carried by the courts to the absurd lengths to which its literal interpretation would logically lead, though it is often oracularly quoted as though it should be taken literally and applied indiscriminately as the touchstone of responsibility wherever fraud appears. The rule can be invoked only with the qualification that the words "enabling a person to cause the loss" must be understood to mean by some act, conduct, or *default in the very transaction in question.* See Freeman v. Cooke, 2 Ex. 654. BLACKBURN, J., in Swan v. North British Australasian Co., 2 H. & C. 181, said: "Neglect must be in the transaction itself, and be the proximate cause of leading the party into that mistake; and also must be the neglect of some duty that is owing to the person led into that belief, or what comes to the same thing, to the general public, of whom that person is one." In Bank of Ireland v. Evans's Charities, 2 T. R. 70, it was held that the negligence in order to operate as an estoppel must be a negligence "in or immediately connected with the transfer itself," and further that it must also be "the proximate cause of the loss." In Le Lievre v. Gould [1893], 1 Q. B. 491, it was held that C is not liable to make good a loss which has fallen upon A by the act of B unless the proximate cause of the loss was a breach of a duty owed by C to A.

Appellee did not breach any duty in this transaction. It did not fail in any precautions which either expressly or by legal implication it was bound to take to protect appellant or the public generally. No act or omission on

its part was the proximate cause of appellant's loss. The election by the appellee of Kornfeld to an executive position in its company was not such negligence toward appellant or toward the general public as to make the company liable for any fraud that Kornfeld would personally perpetrate, or the perpetration of which by him personally would be facilitated by his having the status of a corporate officer. It would be equally logical to hold that an examining board whose certification of character and competency enabled one to become a member of the bar should be held responsible for any fraud such person might personally perpetrate, and the perpetration of which might be aided by reason of the professional status the certificate enabled him to acquire. Before appellant can successfully invoke the rule it relies on, it would have to identify as the proximate cause of its loss a breach of duty, express or implied, on the part of the appellee. This it has failed to do. Whatever loss-occasioning carelessness there was in this case was appellant's own. It accepted as a lease from the appellee corporation a paper that was not signed by an officer of that corporation. A corporation's seal attached to a paper merely raises the presumption that the officer affixing it is duly authorized to act, and is not exceeding his authority in attaching the seal. See Fletcher's Cyc. Corp. (Perm. edition), section 2471, page 160. Here it was not proved that the seal was affixed by any officer of the corporation. The court below found as a fact that "Samuel Kornfeld, as an individual and as lessor, but not as either president or secretary of the Gordon Sanitary Linen Supply Co., executed the lease; the corporate seal was affixed thereto, but whether or not by Kornfeld is uncertain from his testimony; he instructed his secretary to sign as secretary of the corporation, though he knew she was not its secretary; he testified that he so instructed her, 'because he did not think that he could personally sign as he had already signed as lessor,' but we do not believe it was for that reason."

There is no contention here that this spurious lease was signed by any officer of the appellee corporation. In fact, the appellant virtually admits as much by calling attention in its bill of equity to the voluntary nonsuit it suffered when it sued the appellee corporation for arrearages in rent. It says in its bill: "When the plaintiff discovered for the first time that the Eva Blank who signed the said lease as secretary of the said Gordon Sanitary Linen Supply Company was not in fact the secretary, it suffered a voluntary nonsuit." We have not before us a case where a corporation intentionally or negligently clothed its officers or agents with apparent authority to perform acts for it, and where therefore the corporation may be estopped from denying that such apparent authority is real as to an innocent third person dealing in good faith with such officers or agents. The execution by "Eva Blank, Secretary," of the lease appellant relied upon in making its loan to Kornfeld was not an *act* performed for the *appellee corporation,* for it had no such secretary, and this fact the appellant could with diligence have discovered. While the appellant acted with the utmost good faith, it knew that Kornfeld's zeal to secure a loan was entirely in his own interest, and not in the interest of the Supply Company, and, as was well said in Manhattan Life Ins. Co. v. Forty-second St. & G. St. F. Co., 139 N. Y. 146, 34 N. E. 776, 777, "It is an old doctrine, from which there has never been any departure, that an agent cannot bind his principal even in matters touching his agency, where he is known to be acting for himself, or to have an adverse interest. ...... The plaintiff in such a case assumes the risk of the agent's disloyalty to his trust, and has no occasion for surprises when he discovers that the agent has served himself more faithfully than his principal."

In the case before us, it would be anomalous to grant the relief prayer for, in the name of equity.

The decree is affirmed at appellant's cost.